**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| DECISIONING.COM, INC., ) <br> a Delaware Corporation, ) <br> ) <br> Plaintiff, ) <br> ) <br> - v- ) <br> ) <br> TD AMERITRADE HOLDING CORPORATION, ) <br> INC., a Delaware corporation, TD AMERITRADE,) <br> INC., a Nebraska corporation, and ) <br> TD AMERITRADE ONLINE HOLDING ) <br> CORPORATION, (formerly TD WATERHOUSE ) <br> GROUP, INC.), ) <br> ) <br> Defendants. ) <br> _____) | Civil Action No.: 3: 03-2837-CMC <br><br> OPINION AND ORDER <br> GRANTING MOTION FOR <br> SUMMARY JUDGMENT <br> AND SEVERING CLAIMS |

This matter is before the court on motion of Defendants TD Ameritrade Holding Corporation and TD Ameritrade, Inc. (collectively "Ameritrade") for summary judgment of non-infringement under Fed. R. Civ. P. 56. The motion is granted for the reasons and to the extent set forth below.

The third Defendant TD Ameritrade Online Holding Corporation, formerly TD Waterhouse Group, Inc., ("Ameritrade-Waterhouse") was added to this action in June 2006. That Defendant has filed a separate motion for summary judgment which will be addressed by separate order. For reasons set forth at the conclusion of this order, Defendant Ameritrade-Waterhouse is dismissed from this action without prejudice.

**INTRODUCTION**

Plaintiff decisioning.com ("DCI"), brought this action alleging infringement of U.S. Patent No. 6,105,007 ("the '007 Patent") by Ameritrade. Proceedings were stayed for a substantial period of time pending reexamination of the '007 Patent by the United States Patent Office.

1

After reexamination proceedings were concluded, the court scheduled a claim construction hearing in this and two related matters.[1] The court issued its claim construction rulings orally over the course of the two day hearing, setting out its reasons for each aspect of its construction on the record. *See* Transcripts at Dkt Nos. 84 & 85. The oral ruling was followed by a written order setting forth the construction given to each disputed term, but not repeating the reasoning. Dkt No. 83 (Order entered December 6, 2006).

Thereafter, the court received and accepted briefing on a motion to modify the claim construction rulings. Dkt No. 89. This motion was denied. Dkt No. 121 (docket text order). The claim construction, therefore, remains as set forth in the Order entered December 6, 2006.

The motion now before the court turns on the interpretation given to a number of claim terms which were construed by the above referenced proceedings. Specifically, Ameritrade argues that none of its systems: (1) "verify an applicant's identity"; (2) "access at least one database . . . for the information relevant to the applicant's ability and willingness to comply with the account requirements"; or (3) "compare certain of the information received from the applicant and certain of the information received from said at least one database relevant to the applicant's ability and willingness to comply with account requirements." A finding in Ameritrade's favor on any of these three elements would lead to dismissal of all claims asserted against it. In the alternative, Ameritrade argues that it is entitled to partial summary judgment on four separate grounds because: (1) some of its accounts lack the financial risk component; (2) some of its systems *allow* for human assistance; (3) some of its systems *require* human intervention prior to final approval; and (4) some of its

---

[1] The related matters are: *Decisioning.com, Inc. v. Federated Dept. Stores, Inc., et al*, Civil Action No. 3:03-cv-1924-CMC; and *Household Int'l, Inc. v. Decisioning.com, Inc.*, Civil Action No. 3:04-cv-01200-CMC.

systems are accessed using equipment which does not satisfy the court's construction of "remote interface."

As to the last point, DCI concedes that Ameritrade's systems do not literally infringe the "remote interface" limitation in light of this court's construction of the term.[2] DCI asserts, nonetheless, that it has sufficient evidence to present a jury question as to whether this limitation is satisfied under the doctrine of equivalents. As to the remaining limitations, DCI argues that there is evidence from which a jury could find literal infringement.

For reasons set forth below, the court concludes that Ameritrade is entitled to summary judgment as to all claims based on the limitation in the '007 patent requiring verification of identity. In the alternative, the court concludes that Ameritrade is entitled to partial summary judgment based on the limitations relating to requirements for a remote interface and final approval without human intervention. The court declines to address the remaining asserted grounds for summary judgment.

## LEGAL STANDARDS

### I.  Patent Infringement

Infringement of a patent may be either literal infringement or infringement under the doctrine of equivalents. *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000). In either case, the proof of infringement must address each element of the claims. *Id.* ("An accused product infringes if it embodies each claim element or its equivalent.").

**Literal Infringement.** To establish literal infringement, the patent holder must demonstrate that each of the elements or "limitations" of each claim of the patent at issue is present in the accused system. *See, e.g., Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir.

---

[2] This is not, of course, a concession of the validity of that construction.

3

2001); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). Moreover, the accused system must contain each limitation of the asserted claim exactly, without deviation. *Litton Sys., Inc. v. Honeywell, Inc.*, 140 F.3d 1449, 1454 (Fed. Cir. 1998) ("Literal infringement requires that the accused device contain each limitation of the claim exactly; any deviation from the claim precludes a finding of literal infringement."). Therefore, "[i]f even one limitation is missing or not met as claimed, there is no literal infringement." *Mas-Hamilton Group*, 156 F.3d at 1211 (internal citations omitted). *See also Telemac Cellular Corp.*, 247 F.3d at 1330; *Litton Sys., Inc.*, 140 F.3d at 1454.

**Doctrine of Equivalents.** In the absence of literal infringement, a patent holder may also seek to establish infringement under the doctrine of equivalents. Under this doctrine, infringement may be found when: (1) every limitation of the asserted claim, or its equivalent, is found in the accused device, and (2) the equivalent limitation differs from what is literally claimed only insubstantially. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39-40 (1997) (holding, in addressing the function-way-result "triple identity" test, that "the particular linguistic framework used is less important than whether the test is probative of the essential inquiry" of whether each element is insubstantially different). As noted in *Warner-Jenkinson*, "[a] focus on individual elements and a special vigilance *against allowing the concept of equivalence to eliminate completely any such elements* should reduce considerably the imprecision of whatever language is used." *Id.* (emphasis added).

The essential inquiry to be made in determining whether there is infringement under the doctrine of equivalents is, therefore, whether "the accused product or process contains elements identical or equivalent to *each claimed element* of the patented invention." *Id.* at 40 (emphasis

4

added). As further stated in *Warner-Jenkinson:*

> [T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*Warner-Jenkinson*, 520 U.S. at 29.

Therefore, in accordance with the "all elements rule," there can be no infringement under the doctrine of equivalents if any one limitation of a claim or its equivalent is not present in the accused device or method. *See, e.g., Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1333 (Fed. Cir. 2001). Likewise, if a finding of infringement under the doctrine of equivalents "would entirely vitiate a particular claim element," the court must rule that there is no infringement under the doctrine of equivalents. *Bell Atl. Network Servs. v. Covad Communs. Group, Inc.*, 262 F.3d 1258, 1279-1280 (Fed. Cir. 2001).

**Prosecution History Estoppel.** The doctrine of equivalents is, however, subject to a limitation referred to as either prosecution history estoppel or file wrapper estoppel. *See generally Warner-Jenkinson*, 520 U.S. at 30 (noting that the court had not "dispose[d] of prosecution history estoppel as a legal limitation on the doctrine of equivalents"). Prosecution history estoppel applies when an amendment is made during prosecution "to avoid the prior art, or otherwise to address a specific concern–such as obviousness–that arguably would have rendered the claimed subject matter unpatentable." *Id.* at 30-31.

Therefore, "[w]here the reason for [a] change [is] not related to avoiding the prior art, the change may introduce a new element, [without] necessarily preclud[ing] infringement by equivalents of that element." *Id.* at 33. Nonetheless, the court should

>place the burden on the patent holder to establish the reason for an amendment required during patent prosecution. The court then . . . decide[s] whether that reason is sufficient to overcome prosecution history estoppel as a bar to application of the doctrine of equivalents to the element added by that amendment. Where no explanation is established, . . . the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine of equivalents as to that element. The presumption . . . [is] subject to rebuttal if an appropriate reason for a required amendment is established[.] [T]his gives proper deference to the role of claims in defining an invention and providing public notice, and to the primacy of the [Patent and Trademark Office] in ensuring that the claims allowed cover only subject matter that is properly patentable in a proffered patent application.

*Id.* at 33.

## II.     Summary Judgment

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248. There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To defeat a motion for summary judgment, the non-moving party cannot continue to rely on unsubstantiated allegations but instead must present evidence sufficient for a reasonable jury to find in favor of that party, and it must "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A court may grant summary judgment in a patent infringement case, as in any other case. *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988). Summary judgment of non-infringement is properly granted "when no reasonable jury could find that every limitation recited in the properly construed claim [] is . . . found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech*, 254 F.3d 1334, 1339 (Fed. Cir. 2001).

## FACTS

**The '007 Patent**. The '007 Patent discloses and claims a fully-automated, closed loop financial account processing system. The court's construction of the particular claim limitations relevant to the grounds for summary judgment addressed in this order are set out below.

### 1. "Automatic," "Without Human Intervention," and "Without Human Assistance"

These terms mean a system which is fully automated and completed without human involvement (other than by the applicant). This construction does not exclude systems that allow human involvement after all steps described as being performed without human assistance are completed. In the '007 patent, this means steps d.i. through d.v.

### 2. "Whether or Not . . . Approved"

The phrase "whether or not . . . approved" means determining without human involvement whether or not establishment of the financial account was fully approved, not merely reaching a preapproval determination. This means the automated process continues until information is provided to the applicant as to whether the financial account was approved or not approved.

\* \* \*

### 3. "Remote Interface," "Applicant Interface" and "Remote Applicant Interface"

For purposes of the '007 and '811 Patents, these terms refer to dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service, such as but not limited to equipment housed in a kiosk, which allows an applicant (borrower in '811) to provide information to and receive information from a data processing system and which facilitates completion of all

      steps of the claim involving interaction between the applicant (borrower) and the data processing system.

* * *

      **5. "Verify the Applicant's Identity"**

      To "verify the applicant's identity" means to confirm or substantiate the applicant's identity. This is not limited to checking biometric information and does not exclude verification using information such as name, address, and social security number *plus some additional information* less likely to have been improperly obtained (*e.g.*, mother's maiden name, years at current address, years at job, etc).

Dkt No. 83.

      **Ameritrade's Account Processing System.** Ameritrade's accused systems allow consumers to apply for a brokerage account using two categories of interface. Most frequently, the interface used is owned by the consumer or an entity other than Ameritrade. Consumers may, however, also apply online using equipment provided at an Ameritrade branch location. Sykora Decl. ¶ 3.

      In either case, the application is accessed through Ameritrade's internet web page. To begin the process, the applicant selects the type account to be opened: cash, cash and option, cash and margin, or cash, margin and option. *Id.* ¶ 5.

      The applicant provides first and last name, current address, social security number, and date of birth. According to Ameritrade, this is the only information used to check the applicant's identity.

      The applicant is also required to provide additional information including home telephone number, e-mail address, marital status, mother's maiden name, citizenship, employment status and associated employment information , annual income, net worth, liquid net worth, and number of dependents. *Id.* ¶ 6. There is, however, no evidence that this information is used for the purpose of checking identity, with the possible exception of the home phone number.[3]

---

    [3]   DCI offers some prediction of evidence that a phone number may also be used for identification purposes. This prediction of evidence is found in an opinion letter prepared for

8

At the conclusion of the online application process, the applicant is generally advised whether an account has been established in his or her name. Sykora Decl. ¶ 10. Although human assistance through an on-line chat feature is available, this process, though the point of final approval, can be and generally is completed without human assistance. Sykora Depos. at 105.

Margin accounts were, however, treated differently prior to August 21, 2004. That is, prior to that date "all applications for 'cash & margin' and 'cash, margin, & option' accounts were manually reviewed and approved by an Ameritrade Principle" before the account was opened. Harrison Decl. ¶ 4.

**DISCUSSION**

**I.     Arguments for full summary judgment**

Ameritrade offers three arguments in favor of full summary judgment which turn on the following claim terms: (1) "verify an applicant's identity"; (2) "access at least one database . . . for the information relevant to the applicant's ability and willingness to comply with the account requirements"; and (3) "compare certain of the information received from the applicant and certain of the information received from said at least one database relevant to the applicant's ability and willingness to comply with account requirements." The court agrees as to the first ground and declines to reach the other two.

---

Ameritrade which indicates an understanding that a phone number is used as part of the identification process. DCI also suggests that other information obtained by Ameritrade *could* be used to aid in verifying identity. DCI does not, however, direct the court to any prediction of admissible evidence that the other information *is used* for this purpose. By contrast, Ameritrade has offered a sworn declaration that the information is not so used. Sykora Decl. ¶¶ 6 & 7.

9

### A.  **Construction of Claim Term**.

Each claim of the '007 Patent which is at issue in this action requires that the system "verify the applicant's identity."  The court construed this limitation as follows:

> To "verify the applicant's identity" means to confirm or substantiate the applicant's identity. This is not limited to checking biometric information and does not exclude verification using information such as name, address, and social security number *plus some additional information* less likely to have been improperly obtained (e.g., mother's maiden name, years at current address, years at job, etc).

Dkt No. 83 at 3-4 (emphasis in original).

In so construing the '007 Patent, this court declined to accept various limitations proposed by Ameritrade (and aligned parties in the related actions).  For instance, the court declined to impose any requirement for a "biometric" form of verification such as a electronic signature match.

Nonetheless, the construction adopted by the court recognizes that identity "verification" requires a check of information which is *qualitatively* different from the specifically listed items of "name, address, and social security number."[4]  That qualitative difference must be such as to make the information "less likely to have been improperly obtained" than the three specifically listed items.  Of the three listed items, the social security number would be the only one not generally available.  Nonetheless, as DCI correctly notes, the court's use of "such as" preceding the list of examples indicates that the list itself is not exclusive.

---

[4] DCI argues that the format of this construction precludes a finding in Ameritrade's favor because the court did not state what is required, only what is not excluded.  While the court agrees that the format does leave open numerous possibilities as to how identity might be verified, it disagrees that it precludes summary judgment where, as here, the verification method consists of checking the information expressly listed (name, address, and social security number) *plus some additional information*.  Under those circumstances, the "additional information" must satisfy the expressly stated requirement that it be "less likely to have been improperly obtained" than the listed items.  To do otherwise would read out the limitation placed on the "information checking" method of identity verification.

### B.     Literal Infringement.

It is undisputed that Ameritrade's systems consider the first three specified items of information: name, address and social security number. Ameritrade also concedes that it considers additional information in the form of the applicant's date of birth. DCI has also offered some prediction of evidence that the applicant's phone number may also be considered.

Either the date of birth or phone number would satisfy the *quantitative* portion of the verification requirement that something beyond the three listed items be obtained and confirmed. The remaining question is whether the information obtained, either singularly or together, might reasonably be found to satisfy the *qualitative* requirement that it be of a type "less likely to have been improperly obtained" than the three listed items. For the reasons which follow, the court concludes that it cannot.

First, neither a date of birth or phone number are the type of information listed in the examples given in the court's construction. Each of the listed examples consists of items of personal information which the person identified would know without need to resort to other sources and, therefore, would not normally carry around in written form. Further, the information in the listed examples is of a type which would not normally be shared with others in the normal transaction of daily business. As a consequence, it is not the type of information likely to be readily available to someone who steals a wallet or searches through discarded bills. It is, presumably, for these reasons that this type of information is often used for "verification" of identity when photographic identification is not possible, such as in the course of internet or phone transactions.

Indeed, an individual's date of birth is listed on his or her driver's license (normally kept in one's wallet) and is often produced for the purpose of identification or proof of age (*e.g.,* for the

11

purpose of purchasing alcohol or tobacco products). Date of birth is also fairly frequently requested on various applications. Except for reasons of vanity, few individuals are reluctant to share their full date of birth.

Phone numbers, on the other hand, are generally listed in the telephone book along with one's name and address. It is hard to imagine anything that is much more public (save unlisted numbers).

For these reasons, the court concludes that no reasonable jury could conclude that, together or separately, an individual's phone number and date of birth fall within the general types of information provided by the examples or any other category of information "less likely to have been improperly obtained" than the applicant's name, address and social security number. The court, therefore, concludes that DCI cannot establish that Ameritrade's systems "verify the identity" of the applicant as that phrase has been construed by this court.

    **C.**    **Doctrine of Equivalents**.

DCI does not rely on the doctrine of equivalents as to this claim limitation.

**II.**    **Arguments for Partial Summary Judgment**

In addition to the above grounds for full summary judgment, Ameritrade argues that it is entitled to partial summary judgment on four separate grounds. Ameritrade asserts that, collectively, these grounds would lead to full summary judgment. For the reasons set forth below, the court finds that two of these grounds warrant partial summary judgment. The court declines to reach the remaining grounds.

    **A.**    **Applications for Margin Accounts Prior to August 21, 2004**

Prior to August 21, 2004, margin accounts required human assistance for approval. DCI concedes that Ameritrade is entitled to summary judgment as to any such accounts where requested

as part of the initial application. Summary judgment is granted to this extent.[5]

### B.     Remote Interface

**Construction of Claim Term**. Each asserted claim of the '007 Patent requires a "remote interface," or depends from a claim including this or the synonymous limitations: "applicant interface" and "remote applicant interface."[6] The court construed these terms, collectively, as follows:

> For purposes of the '007 [Patent], these terms refer to *dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service*, such as but not limited to equipment housed in a kiosk, which allows the applicant . . . to provide information to and receive information from a data processing system and which facilitates completion of all steps of the claim involving interaction between the applicant . . . and the data processing system.

Dkt No. 83 at 3 (emphasis added).

**Literal Infringement.** DCI concedes that there is no literal infringement of this claim limitation because the Ameritrade systems do not use "dedicated computer equipment."

**Doctrine of Equivalents**. DCI argues, nonetheless, that the limitation is met under the doctrine of equivalents. This argument, in its various subparts, seeks to establish that essentially the same functions of the patented system can be performed on a consumer-owned personal computer as on dedicated computer equipment.

---

[5] The grant of summary judgment does not, therefore, extend to any account which was opened prior to this date unless it included a margin option in the original application.

[6] Some of the claims in the '007 patent use the terms "applicant interface" or "remote applicant interface." The manner of use suggests that these terms and "remote interface" are interchangeable as used in the '007 patent. In any event, the parties agreed that they should be construed uniformly. References in this order to "remote interface," therefore, also encompass the terms "applicant interface" and "remote applicant interface."

DCI's approach misapprehends the essential nature of the limitation which requires that the remote interface consist of "dedicated computer equipment, meaning equipment supplied by the entity providing the financial account or service." As explained during the claim construction hearing, dedicated computer equipment "clearly means not the consumer's equipment or not a home computer." Transcript at 1-168. The intent of this construction was "to exclude personal computer systems owned and controlled by the consumer, or by the applicant." Transcript at 1-191.

By definition, a consumer-owned piece of equipment, regardless of how similar it may otherwise be, cannot be the equivalent of "dedicated computer equipment . . . supplied by the entity providing the financial account or service." This is because items which are opposites cannot be "equivalents." *See Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 955 (Fed. Cir. 2006) (stating that "[a] claim that contains a detailed recitation of structure is properly accorded correspondingly limited recourse to the doctrine of equivalents" and holding that a structure which is "concave" cannot be the equivalent of a structure which is described as "convex"). *See also Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1322 (Fed. Cir. 2002) (holding that a limitation describing an entry point as being "above" two specified plugs could not be the equivalent of an entry point "between" the two plugs); *Moore U.S.A., Inc., v. Standard Register Co.*, 229 F.3d 1091, 1094 (Fed. Cir. 2000) (holding that claim which required adhesive strip cover a "majority" of a particular length of a form could not be met equivalently by a device which used a strip which extended only 47.8% of the length of the form because, as a matter of law, a "minority" could not be a "majority").

DCI cannot, in any event, succeed under the doctrine of equivalents because "dedicated computer equipment" is not the equivalent of a consumer-owned personal computer. Consumer-owned personal computers are normally used for a wide range of functions, including but hardly

14

limited to: on-line shopping; word processing; photograph storage; Internet surfing; e-mailing; and game playing. To the extent these activities involve business transactions, the transactions would not be limited to any particular vendor. By contrast, "dedicated computer equipment" would be limited to providing specific functions (here related to the relevant financial transactions) and would generally be limited to services provided by a single entity (or a related group of entities).

**Prosecution History Estoppel**. Prosecution history estoppel also limits DCI's application of the doctrine of equivalents to Ameritrade's systems. The original patent application, from which the '007 patent descended, was filed on August 27, 1993. *See* U.S. Patent App. 08/113,205 at 2. It included a disclosure of an alternative to a kiosk for the interface and stated that "[i]n an alternative embodiment, borrowers can apply for a loan *using a personal computer 34 and a modem 36 . . . .*" *Id.* at 24, ll. 20-22. As originally written, the first element of claim one of this application referred to a method which utilized "a programmed computer and a communication link." *Id.* at 29.

The path from this application to the issuance of the '007 patent involved a number of rejections and subsequent continuation-in-part and continuation applications (collectively "subsequent applications"). The reference to "using a personal computer . . . and a modem" was dropped from these subsequent applications. *See, e.g.,* U.S. Patent App. 08/327,653 filed October 24, 1994 (continuation-in-part application). As originally written, the first claim of this application referred to a system which utilized a "kiosk" and a "computer controller carried by said kiosk and programmed to interact with said consumer." *Id.* at 27.[7]

---

[7] Notably, this and later applications in the series leading to issuance of the '007 patent described a system which included significantly broader capabilities than in the earlier application. Many of the newly listed functions would require capabilities not found on most personal computers, particularly those available at the time of the initial continuation-in-part application.

A later continuation application in this series, filed on May 5, 1999, removed the reference to a kiosk from the initial claim,[8] referring instead to:

> An automatic account processing system . . . for applicants located at a remote interface, said system comprising:
>
> a. a remote interface adapted to:
>
>     i.    allow an applicant to remotely request an account;
>     ii.   receive data from an applicant[.]

U.S. Patent App. 09/305,622 at 3.

The term "remote interface" was not otherwise defined in the claims or elsewhere in the specifications. The specifications do, on the other hand, retain numerous references to kiosks and, as noted above, make no reference to a consumer-owned personal computer based alternative embodiment. Nothing else in this or any other document in the claim history following the October 24, 1994 application suggests an intent to encompass a consumer-owned personal computer within the meaning of "remote interface."

The prosecution history of the '007 Patent, therefore, reflects abandonment of consumer-owned personal computer as the means of interacting with the central system. DCI has offered no explanation of the change which would be sufficient to overcome prosecution history estoppel. *See Warner-Jenkinson*, 520 U.S. at 33 (quoted *supra*).[9] Consequently, the history reflects an intent not

---

[8] The application asked that the existing claims 1-20 be cancelled and replaced. The new "first" claim, therefore, is reflected as claim 21 on this page of the application.

[9] While DCI acknowledges the existence of prosecution history estoppel as a limitation on the doctrine of equivalents, it never directly addresses its application to the "remote interface" element. Instead, DCI suggests that the court has already rejected any reliance on prosecution history estoppel. *See* Dkt No. 144 at 5 (DCI memorandum in opposition to summary judgment). This argument rests on a misconstruction of the order denying DCI's Motion for Reconsideration and Clarification of the Claim Construction which stated only that the court had not relied on prosecution

to include consumer-owned personal computers as an equivalent of "remote interface." *See Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1558 (Fed. Cir. 1996). Therefore, prosecution history estoppel precludes DCI from relying on the doctrine of equivalents to encompass a system which utilizes a consumer-owned personal computer.

## CONCLUSION

For the reasons set forth above, the court concludes that Defendants TD Ameritrade Holding Corporation and TD Ameritrade, Inc. are entitled to summary judgment of non-infringement, in full, due to the absence of evidence sufficient to support a finding in DCI's favor as to the verification of identity element. In the alternative, these Defendants are entitled to partial summary judgment of non-infringement to the extent applications were made using equipment owned by the consumer or provided by a third-party (any entity other than one of the Defendants). These Defendants are also entitled to partial summary judgment as to pre-August 21, 2004 applications which initially included a request for a margin account and, therefore, required human intervention for final approval.

This disposes of all claims against these two Defendants. In light of this determination, the court dismisses, without prejudice, the counterclaims of these Defendants.[10]

Finally, the court severs and dismisses, without prejudice, the claims against the remaining Defendant, TD Ameritrade Online Holding Corporation (formerly TD Waterhouse Group, Inc.). These claims were not added to this action until June 2006, and now appear to be based on a

---

history estoppel in *construing* the claim terms. *See* Dkt No. 123. As noted in that docket text order: "the distinct doctrine of prosecution history estoppel . . . would be applicable, if at all, only at a later stage in the proceedings." Clearly, that stage is now presented, given DCI's reliance on the doctrine of equivalents in response to the motion for summary judgment.

[10] These Defendants have asserted two counterclaims, one for a finding of invalidity and one for a finding of non-infringement.

different system. The court finds severance to be the proper course in light of the age of the present action, the separability of the issues (as evidenced, in part, by the separate summary judgment motions), and the termination of claims relating to the original Defendants.

The claims against and counterclaims asserted by Defendant TD Ameritrade Online Holding Corporation are, therefore, dismissed without prejudice from this action. **Plaintiff may file a new action against this Defendant within ten days of entry of this order**, in which event the filing shall be deemed to relate back to the filing date of the Amended Complaint in this action. Within one week thereafter, the parties shall confer and submit a joint listing (by docket number) of all docket entries in this action which should be deemed filed in the severed action. Those documents shall be linked by the Clerk of Court so that no refiling of the documents is necessary. Documents relating to any currently pending motion which are designated for inclusion will renew that motion on the docket but shall not revive any filing deadlines.

IT IS SO ORDERED.

 s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 28, 2007

C:\temp\notesB0AA3C\03-2837decisioningvameritrade holding & inc.wpd